# In the United States Court of Federal Claims

No. 15-1171C
(Filed Under Seal: December 16, 2015)
(Reissued for Publication: December 18, 2015)[*]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| FFL PRO LLC, | * | Postaward Bid Protest; Cross-Motions for |
| | * | Judgment on the Administrative Record; |
| Plaintiff, | * | Past Performance; Solicitation |
| | * | Interpretation; Evaluation of Proposals; |
| v. | * | Inadequate Explanation of Exercise of |
| | * | Discretion; Assignment of Strengths and |
| THE UNITED STATES, | * | Weaknesses; Best Value Tradeoff; |
| | * | Injunctive Relief |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Michael A. Gordon, Washington, DC, for plaintiff.

Tanya B. Koenig, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this postaward bid protest, plaintiff FFL Pro, LLC contends that the United States Department of State's Office of Antiterrorism Assistance ("ATA") improperly deviated from the solicitation when it awarded a cyber security training contract to VariQ Corporation ("VariQ"). The parties have each moved for judgment on the administrative record. For the reasons set forth below, the court grants in part and denies in part both motions, and awards plaintiff the injunctive relief it deems appropriate.

---

[*] The court provided the parties with an opportunity to suggest redactions to this ruling, but in an December 18, 2015 joint status report, they indicated that no redactions were necessary.

## I. BACKGROUND

### A. The Solicitation

On January 17, 2014, the ATA issued solicitation number SAQMMA14R0093 for the acquisition of overseas cyber security training services and supplies.[1]  AR 26, 28, 59.  As explained in the solicitation's statement of work, the contemplated purpose of the contract was to "provide for planning, procuring and preparing equipment and supplies, delivery of training courses to include instructors and the shipment of enabling resources to and from countries as specified in a task order."  Id. at 59.  The statement of work also included descriptions of the following eighteen courses and conferences that constituted the ATA's cyber security training program:  Executive Seminar on Digital Investigations and Security; Identification and Seizure of Digital Evidence; Identification and Seizure of Digital Evidence–Train-the-Trainer; Identification and Seizure of Digital Evidence–Train-the-Trainer Mentoring; Introduction to Digital Forensics and Investigations; Fundamentals of Network Security; Cyber Awareness for Prosecutors Course; Principles of Internet Investigation Course; Mobile Device Forensic Consultation; Digital Forensics Equipment Grant and Consultation; Mac Forensics Consultation; Advanced Digital Forensics Consultation; Cyber Unit Management Consultation; Digital Forensics Lab Mentoring Consultation; Domestic Cyber Management Consultation; Specialized Hardware/Software Consultations; Audio Video Forensics Consultation; and Specialized Conferences.  Id. at 59-63.  And, the statement of work set forth the responsibilities for certain key personnel that would be required to perform the contract, including a program manager.  Id. at 63-64.  The program manager was to "provide oversight of the entire program encompassed by the contract and accountability for the management and execution of all tasks and subcontracts awarded under [the] contract."  Id. at 63.  Although the ATA described the responsibilities for other key personnel in the original statement of work, it subsequently amended the solicitation to require offerors to identify only a program manager in their proposals.[2]  Id. at 303, 329-30.

Offerors were instructed to submit their proposals in two volumes:  a technical volume and a price volume.  Id. at 53.  The proposals would be evaluated according to five factors; in descending order of importance, these factors were:  (1) Technical Compliance With all of the Terms and Conditions of the Solicitation ("Technical Compliance"); (2) Corporate Experience;

---

[1] The facts in the background section are derived solely from the administrative record ("AR").

[2] There were two other required positions described in the original statement of work–a cyber logistician and an operations manager.  See AR 64.  The ATA indicated in Amendment 001 to the solicitation that the contract awardee would not be responsible for providing a cyber logistician.  See id. at 193, 291; accord id. at 166.  And, the ATA removed the operations manager position in Amendment 002 to the solicitation.  See id. at 329-30, 425; accord id. at 303.

(3) Past Performance; (4) Status of Property Management; and (5) Price.[3]  Id. at 53-56, 496.  Of particular relevance in this bid protest are the first three factors, which were described as follows:[4]

[1]  Technical Compliance . . . .

(i)  Demonstrate adherence to all the requirements and terms by responding in accordance with the instructions with all the requested information and demonstrating technical understanding of all requirements in the Statement of Work . . . .

. . . .

[2]  Corporate Experience [Prime and Subcontractor(s)]

(i)  Submit a . . . narrative describing the company's corporate experience.  Your company shall provide the type of supplies and/or professional services procured by either a Government or Commercial entity for a minimum of two years.  At a minimum, the narrative shall include the following:

(A)  Organization's number of years of corporate experience relevant to this offer.

(B)  Organization's structure, to include size, experience in the field, and resources available to enable the offeror to fulfill requirements.

(C)  Brief history of the organization's activities contributing to the development of relevant expertise and capabilities.

(D)  Information that demonstrates organizational and accounting controls and manpower presently in-house or the ability to acquire the type and kinds of manpower proposed.

---

[3]  In the original solicitation, the ATA indicated that a sixth factor, Financial Responsibility, would also be evaluated.  See AR 56.  However, in Amendment 004 to the solicitation, the ATA advised that Financial Responsibility would only be used by the contracting officer for the purpose of making a responsibility determination; the factor would not be evaluated as part of the offerors' nonprice proposals.  See id. at 465, 496.

[4]  The ATA modified these descriptions in the amendments to the solicitation.  Compare AR 53-56 (containing the original solicitation), with id. at 183-84 (containing Amendment 001), and id. at 454-55 (containing Amendment 003).  The descriptions quoted by the court are found in Amendment 003 to the solicitation.

. . . .

(F)  Demonstrate Program Manager and Operations Manager experience in managing an international training program.  . . .

(G)  Demonstrate accessibility to qualified facilitators.  Facilitators must be eligible to travel on short notice to countries in distant locations. [Acknowledgment] of extended availability for international travel is required. The proposed facilitators are required to possess all required travel documents (U.S. passports) upon contract award.

[3]  Past Performance

Offerors are advised to use references from projects involving relevant IT supplies and IT training services within the scope of this solicitation and in compliance with [Federal Acquisition Regulation ("FAR")] 52.212-1.  (i)  Provide a description of the offeror's experience in the professional information technology services and cyber training services industries referenced in the [request for proposals].  Describe three completed or on-going project(s), similar in size and complexity to the effort contemplated herein and in sufficient detail for the Government to perform an evaluation.  Two of the three projects described must be prior federal government with overseas deployment training experience on cyber training.  Indirect relationships with Government agencies are acceptable (i.e., your firm trains instructors who teach classes under Federal contracts with other firms), but substantial evidence must be provided.  Each example shall have been within the last two years, whether completed or ongoing.  All examples of completed services shall have been found to be acceptable by the ordering activity.  If the Offeror cannot provide three examples of past experience, [it] may provide additional documentation to substantiate project experience to be evaluated by the Contracting Officer.  Offerors shall demonstrate that the tasks performed are of a similar complexity to the work solicited under this solicitation. Demonstrate the ability to manage a multi-million dollar series of training in a global theatre.  Many simultaneous iterations requiring expanded staffing resources to support deliveries.  Demonstrated experience should include direct support of an international law enforcement training program.  An emphasis should be on law enforcement and not [United States Department of Defense] engagements.  Illustrate experience in the acquisition, configuration and international shipping of various computer related components.  Demonstrate existing OEM (Original Equipment Manufacturer) partnerships and the ability to forge necessary manufacturer relationships to ensure compliance with required licensing and End User License Agreements.

For each Past Performance Contract Profile submitted with its proposal, the offeror should send a Past Performance Questionnaire . . . to the respective customer reference (e.g. Contracting Officer, Contracting Officer's Representative, or other person with direct knowledge of the offeror's performance), asking them to complete and return the survey by email to [the ATA].

. . . Only Past Performance Questionnaires reflecting the prime contractor's Past Performance will be considered for award. For the purposes of evaluation, the Government will not accept or consider Past Performance Questionnaires for subcontractors.

Id. at 454-55. Offerors were advised that the nonprice factors would be "evaluated using an adjectival rating system," and that "[o]nce the adjective is assigned for each area of the requirements, an overall adjectival rating [would] be applied" to each nonprice proposal. Id. at 53. The adjectival ratings for the nonprice factors other than Past Performance were described as follows:

| Rating | Description |
|---|---|
| Superior | Proposal exceeds most solicitation requirements, demonstrates exceptional understanding of the requirements and has features that offer some advantage to the Government. Offer has a high probability of success with the lowest potential for unsuccessful performance. |
| Good | Proposal meets solicitation requirements and demonstrates an adequate understanding of the requirements with more strengths than weaknesses. Clarifications can usually resolve any issues and there is [a] reasonable probability of success with average potential for unsuccessful performance[.] |
| Marginal | Proposal does not meet all solicitation requirements and does not demonstrate understanding of the requirements with one or more weaknesses which may require correction. The offer has ambiguities with a high probability for unsuccessful performance and high potential for failure. |
| Unacceptable | Proposal does not meet the requirements and contains one more [sic] significant deficiencies with many weaknesses and ambiguities. No potential for successful[] performance and proposal is non-compliant with the solicitation requirements. |

Id. at 56-57.  And, the adjectival ratings for the Past Performance factor were described as follows:

| Rating | Description |
|---|---|
| Exceptional | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform or exceed the requirements.  It is unlikely that Government intervention will be needed in order to obtain the required services. |
| Satisfactory | Based on the offeror's recent/relevant performance record, the Government finds the past performance to meet the requirements.  The Government has [a] reasonable expectation that the offeror will successfully meet the required effort.  Some Government intervention may be needed in order to obtain the required services. |
| Neutral | The offeror has stated that they have no past performance or relevant record of similar performance and requests this rating.  Government check of resources produces no evidence of [similar] performance and no other rating can be reasonably assigned. |
| Inadequate | Based on the offeror's recent/relevant performance record, significant doubt exists that the offeror can meet the requirement.  Inappropriate past performance is offered that is not similar in size and scope to the requirements.  Government check of resources produces evidence of poor performance on other similar efforts or potential unsuccessful performance can be reasonably concluded from past performance [information] offered. |

Id. at 57.  The nonprice factors, when combined, were more important than price.  Id. at 56.  The ATA intended to award the contract "to the responsible offeror whose offer conforming to the solicitation [was] most advantageous to the Government, price and other factors considered."  Id.

The ATA amended the solicitation on six occasions.  Id. at 155-501, 540-42.  As noted above, the amendments included changes to the descriptions of the evaluation factors, changes to what would be evaluated, and changes to the required number of key personnel.  Additional information relevant to plaintiff's allegations in this bid protest was contained in Amendments 001 and 002.

In Amendment 001 to the solicitation, the ATA provided answers to questions posed by prospective offerors.  Id. at 277-90.  Some of these questions and answers related to the Past Performance factor:

> 20.  Is it a requirement for the prime to provide relevant past performances, or will the government accept past performances from its team members?
>
> Both, if your firm intends to subcontract we would expect to hold them to the same requirements as the prime vendor.
>
> 21.  Is it a requirement for the prime to provide demonstrated experience in managing an international training program or will the government accept demonstrated experience from its team members as well?
>
> Both, if your firm intends to subcontract we would expect to hold them to the same requirements as the prime vendor.
>
> . . . .
>
> 7.  Is the requirement for 2 years of experience of cyber training overseas a requirement for the prime, or for the team (including subcontractors)?
>
> Both.  If your firm intends to subcontract, we would expect to hold the subcontractor to the same requirements as the prime vendor.
>
> 8.  We have concerns that the wording for the past performance requirement dictating that 2 of the 3 past performances must be with the Federal government [is] excluding past performances of equal or greater relevance to the subject of the [request for proposals].  . . .  Can this requirement limiting 2 of the 3 past performances be modified to encompass commercial training activities that are offered and provided to individuals and elements of the Federal Government, but are not a stand-alone contract with the Federal Government?
>
> Two of the three projects must be prior Federal Government (indirect or direct–must carry weight) or commercial projects of similar subjects offered to federal government personnel.  Yes, your submission will be acceptable.

Id. at 279, 287-88.  Other questions and answers related to the scope of the work to be provided; in response to inquiries regarding whether the existing courses required modification or development, the ATA indicated that it did not expect that any modifications or development would be necessary, particularly in the short term, but that it would entertain suggestions for course improvement during contract performance.  Id. at 278, 281, 283.

Amendment 001 also addressed the provision of course instructors.  Specifically, the ATA added a contract clause providing that the contract awardee was required to offer workers who are displaced by the contract award the right of first refusal of employment under the new contract, id. at 175 (incorporating FAR 52.222-17), likely in response to some of the questions that it received, see, e.g., id. at 284 ("[Q:] How will independent contractors be captured on this effort?  We utilize a majority of them as expert, adjunct instructors.  [A:] Incumbent contractors performing under this contract [who] are displaced will be offered right of first refusal with the awardee, to be worked [out] during transition after award, clause included in amendment 1 based on Executive Order.").  The ATA provided further information regarding course instructors in response to other questions:

> 2.  Do all instructor resumes need to be vetted by the Department of State?  Or is there a list of pre-qualified instructors they would like us to use?
>
> This will be worked out with the awardee after award.  The Government may have incumbent instructors that need to be retained under the new award, otherwise if the awardee has instructors we would like to know about the offeror's instructors or the offeror's ability to obtain instructors should incumbent instructors waive their right of first refusal.
>
> . . . .
>
> 13.  Is there a pool of existing certified trainers?  This pool was said to number about 600, with perhaps one quarter of those experienced in the ATA Cyber Training Program.  The expectation that this resource pool was available precluded an advance effort to build another pool.  Will the government provide, either in advance, or to the awarded prime, a pool of vetted cyber professionals to deliver the curriculum on site?
>
> We do not know where the suggestion of 600 qualified instructors originated from.  We can only suggest that we have a fraction of that number.  From a technical perspective, it is the responsibility of the vendor to provide documentation that they are able to provide instructors qualified as stated within the [statement of work].  Subsequently, it is the responsibility of the vendor to provide this staffing, not ATA.  The Government will not provide in advance during the solicitation phase any such list of incumbents.  However, if there are any incumbent contractor's employees displaced by this award, a list of incumbent contractor employees will be provided to the awardee for compliance with Executive Order 13495 if they are qualified for those positions.

Id. at 286, 288-89.

In Amendment 002 to the solicitation, the ATA responded to another question regarding the Past Performance factor:

> 17.  Regarding Question 20 ([from the first set of] Questions and Answers).  The response appears to expect both Prime and Subcontractors to provide 3 past performance responses each.  If that is true [then] it appears the Government required that both the prime contractor and the subcontractor meet the Past Performance requirement ["]two of the three projects described must be prior federal government with overseas deployment training experience on cyber training.["]  For many small business[es] and hubzones this is difficult to meet to have 2 past performances each having federal Government with overseas deployment experience on cyber training.  There are believed to be only a handful of small businesses and hubzones that can meet this requirement and team together.  Will the Government clarify [whether] this requirement is for three past performances for the prime, sub or both with a total of 3 required?  Or does the Government require 3 from each team member (which would require 9 fully compliant past performances for the team)?  The latter would only be met by a few, severely limiting competition to so few [that] the competition would appear to be unfair to competitors.

> The prime must provide 3 and the sub must provide 3.  The Government will provide a "neutral" rating to firms with no past performance.  We would recommend trying to provide similar experience as well with overseas deployment training in general to convey relevance–in such cases they could be of similar value to overseas cyber training.

Id. at 417.  And, with respect to the provision of course instructors, the ATA indicated:

> 6.  Please confirm who is responsible for training personnel to be prepared to teach events. . . .  What process is used now to train and vet personnel? . . .  How does State expect vetting . . . to occur if no training is included? . . .

> The vendor is required to provide instructors [who] meet the stated requirements.  ATA will review the resumes of proposed instructors and will perform [its] own vetting/confirmation of their capabilities. . . .  ATA does not provide allowances for the contractors to recruit/train prospective instructors.

Id. at 414-15.  Amendment 002 also contained the final deadline for proposals:  February 26, 2014.  Id. at 425.

**B.  Evaluation of Proposals and Source Selection Decision**

Thirteen offerors, including plaintiff and VariQ, submitted proposals to the ATA by the deadline.[5]  See generally id. at 544-2742.  As set forth in the source selection plan, see id. at 12, a Technical Evaluation Team assessed the proposals and, for each proposal, assigned consensus adjectival ratings for both the individual nonprice factors and the nonprice proposal overall, see generally id. at 3286-364.  With respect to the proposals submitted by plaintiff and VariQ, the Technical Evaluation Team assigned the following ratings:

| Evaluation Factor | Plaintiff | VariQ |
|---|---|---|
| Technical Compliance | Superior | Superior |
| Corporate Experience | Good | Superior |
| Past Performance | Satisfactory | Exceptional |
| Status of Property Management | Good | n/a[6] |
| Overall | Good | Superior |

Id. at 3286-97.

In addition to assigning adjectival consensus ratings for each nonprice proposal, the Technical Evaluation Team provided narrative summaries and identified strengths and weaknesses.  See generally id. at 3286-364.  For plaintiff's proposal, the Technical Evaluation Team determined the following:[7]

---

[5]  Specific aspects of the proposals are addressed, as necessary, in the court's discussion of the parties' cross-motions for judgment on the administrative record.

[6]  The Technical Evaluation Team's evaluation form did not indicate a consensus adjectival rating for VariQ's proposal on the Status of Property Management factor.  See AR 3296.  However, a subsequently prepared document indicates that the rating was "Good."  See id. at 3387.

[7]  All but the evaluation factor headings are direct quotations from the Technical Evaluation Team's evaluation forms.

Factor:  Technical Compliance

Narrative Summary:

Superior understanding and conveyance of the requirements of the [statement of work].  Demonstrated competency in all aspects of the technical requirements. Demonstrated core competency in the field of digital investigative centric programs.

Strengths:

- Offeror clearly understands the requirements of the project demand[] the managing and delivery of courses and enabling equipment.
- Offeror understand[s] that [it] will serve as representative[] under the direction of ATA (section 2, 2-4).
- Offeror specializes in the specific digital investigative centric programs and resources being delivered by ATA.
- Superior understanding of logistical demands associated with all aspects of a global program (section 2, 2-5).
- All "facilitators are screened and vetted with ATA." (section 5, 5-2)
- [It is] cognizant of the importance of the target audience.
- Understands that project management as well as subject matter expertise [are] integral part[s] of the project.

Factor:  Corporate Experience

Narrative Summary:

Proposal exceeds solicitation requirements, demonstrates a good understanding of the [statement of work].  The information provided demonstrates organizational accounting controls and in house manpower to accomplish the task.  The program manager and instructors are well qualified.

Strengths:

- Demonstrated experience managing a multi-dollar [sic] training program (section 3, 3-10)
- The vendor's pool of managers possesses substantial experience managing international cyber programs.
- Demonstrated ability to maintain and track the scope of the project (section 5, 5-4)
- Evidence of sustained access to the hardware/software referenced in the [statement of work] Original Equipment Manufacturer (OEM) partnerships.

Factor:  Past Performance

Narrative Summary:

The vendors [sic] past performance meets all requirements outlined in the
[statement of work] and indicates a high probability of successfully completing
the project.[8]

The Past Performance [Questionnaires] (PPQs) were reviewed by the TET.
However, it was identified that the PPQ responses were provided by teaming
partners of the offeror and may therefore not be objective.

FFL Pro had no contracts or other information listed in the Past Performance
Information Retrieval System (PPIRS).

Strengths:

• The vendor presented various examples of successfully addressing on the
  ground issues associated with delivering the ATA overseas (section 3, 3-9).
• The vendor has a demonstrated [successful] past performance as a
  subcontractor managing the ATA Cyber Program.

Overall

Proposal meets solicitation requirements and demonstrates an adequate
understanding of the requirements with more strengths than weaknesses.
Clarifications can usually resolve any issues and there is reasonable probability of
success with average potential for unsuccessful performance[.]

Id. at 3286, 3288-89, 3291 (footnote added).

The Technical Evaluation Team determined the following for VariQ's proposal:

_____

[8] Due to the lack of an apostrophe in the word "vendors" to indicate whether a singular or
plural possessive form of the noun was intended, it is unclear whether the Technical Evaluation
Team was referring only to plaintiff, or to plaintiff and its subcontractors.

-12-

Factor:  Technical Compliance

Narrative Summary:

The proposal exceeds most of the solicitation requirements and demonstrates an extremely good understanding of the requirements with more strengths than weaknesses.  There is a high probability that this vendor will be able to perform the tasks needed without any intervention.

Strengths:

- Clear understanding of roles and scope of project
- Excellent background knowledge of ATA and solicitation requirements
- Has a high probability of success

Factor:  Corporate Experience

Narrative Summary:

The corporate experience presented in the proposal exceeds most of the solicitation requirements.  It demonstrates an extremely good understanding of the requirements and experience needed to perform the tasks with more strengths than weaknesses.  There is a clear understanding of the management structure and key personnel required for the project.

Strengths:

- The vendor's core competency is cyber investigations and IT infrastructure
- The vendor is well versed in training in an international setting
- Robust description and identification of key personnel with clear management structure.

Factor:  Past Performance

Narrative Summary:

Based on the vendors [sic] stated past experience and the PPIRs [reports] presented[,] there is a high expectation that the vendor will be able to perform or

exceed the requirements of the statement of work successfully.[9]  It is unlikely that
Government intervention will be needed in order to obtain the required services.

Strengths:

• The majority of the vendors [sic] stated experience is centric to cyber
  training[10]
• Excellent reviews from multiple government and public entities (see PPIRs
  attachments)

Overall

The VariQ proposal exceeds most of the basic requirements stated in the
[statement of work].  The vendor has shown superior understanding of the scope
of the project and availability of the skills and manpower needed to perform the
tasks outlined.

There is sufficient indication that very minimal intervention will be needed from
the Government and there will be a good return on investment.

Id. at 3292, 3294-95, 3297 (footnotes added).  The Technical Evaluation Team did not identify
any weaknesses with either proposal.  Id. at 3286-97.

The Technical Evaluation Team finalized its evaluations in September 2014.  Id. at 3285.
Subsequently, in April 2015, the ATA issued a document titled "Price Negotiation Memorandum
(PNM) and Award Recommendation."  Id. at 3365-400.  It appears that the entire
document–except for the final page–was prepared by an ATA contract specialist and an ATA
contractor management analyst.  See id. at 3367 (noting that the "Price Negotiation
Memorandum/Award Summary" was prepared by those two individuals for the contracting
officer).  Prior to that final page, the document included:  (1) background information regarding
the procurement, id. at 3367-71; (2) summaries of the price proposals, id. at 3371-76; (3) the
contracting officer's price analysis, id. at 3376-80; (4) descriptions of the source selection plan,
the solicitation and amendments, and the source selection process, id. at 3381-86; (5) the
Technical Evaluation Team's consensus adjectival ratings, narrative summaries, and assigned
strengths and weaknesses for each proposal, id. at 3387-99; and (6) an award recommendation,
id. at 3399.  The final page, which was identified in the table of contents as the "approval," id. at
3367, contained a sentence reflecting the contracting officer's award decision and the contracting

---

[9]  Due to the lack of an apostrophe in the word "vendors" to indicate whether a singular or
plural possessive form of the noun was intended, it is unclear whether the Technical Evaluation
Team was referring only to VariQ, or to VariQ and its subcontractors.

[10]  See supra note 9.

officer's signature, id. at 3400.  Of importance are the final two sections of the document, which the court reproduces here in full:

Award Recommendation

VariQ Corporation (VariQ) was the only firm out of thirteen (13) proposals to receive an overall "Superior" rating on [its] Technical Evaluation.  There were several firms with "Good" overall Technical Evaluation ratings.  The solicitation evaluation procedures . . . under FAR 52.212-2 Evaluation - Commercial Items [specify that] non-cost/price factors [(]Technical Compliance, Corporate Experience, Past Performance and Status of Property Management[),] when combined, are significantly more important than cost/price.

Section "M" of the solicitation stated that all evaluation factors other than price, when combined, are significantly more important than price, and that the proposal offering the best value is the one that is most advantageous to the Government, price and other factors considered.  Section M states that "Technical and all other factors 2-4, when combined, are more important, when compared to price."

Factor 1:  Technical Compliance.  The [Technical Evaluation Team] gave VariQ a "Superior" rating for Technical Compliance.  VariQ earned a technical rating of "Superior" because [it] had a clear understanding of the [statement of work] and had excellent background knowledge of ATA and the requirement.  VariQ had no weaknesses in the Technical Compliance section, thus[,] combined with the aforementioned background knowledge and grasp of scope of work[,] VariQ received a "Superior" rating.

Factor 2:  Corporate Experience.  VariQ earned a "Superior" rating under Corporate Experience because [it was] able to prove to the [Technical Evaluation Team] that [its] "core competency is cyber investigations and IT infrastructure.  The vendor [VariQ] is well versed in training in an international setting.  Robust description and identification of key personnel with clear management structure." VariQ had no weaknesses, so the [Technical Evaluation Team] rated them as 'Superior'.

Factor 3:  Past Performance.  VariQ earned an "Exceptional" rating for having several positive PPIRS (Past Performance Information Retrieval System) reports that were cyber security relevant, and had no negative reports.

Factor 4:  Status of Property Management.  VariQ earned a "Good" rating under Status of Property Management, and had no strengths or weaknesses identified.

VariQ['s] submitted price proposal, base plus four option years, [was] for a grand total of $5,303,260.23.  VariQ offered the third lowest price proposal in comparison with the Independent Government Cost Estimate (IGCE), with a grand total of $8,886,714.35.  VariQ's price proposal was 60% of the IGCE.

[Approval]

Based on the foregoing, the Contracting Officer determines that award of contract number SAQMMA15D0006 be made to VariQ Corporation in the amount of $5,303,260.23 for the period April 20, 2015 through April 19, 2020 (base and four option years), said contract price being fair and reasonable and in the best interests of the U.S. Government.

Id. at 3399-400.  All of the offerors were notified of the contract award to VariQ on April 7, 2015.  See generally id. at 3401-65.

## C.  Prior Bid Protests

Plaintiff received a written debriefing from the ATA on April 9, 2015.  Id. at 3493-97. Five days later, it lodged a bid protest at the United States Government Accountability Office ("GAO"), arguing that its proposal should have been more highly rated and that the ATA improperly deviated from the terms of the solicitation by giving undue weight to the price factor. Id. at 3543-53.  On May 4, 2015, the ATA advised the GAO that it had determined that it was in its best interest to take corrective action, and that "[t]he scope of the corrective action [would] include review and validation by the Contracting Officer of the [Technical Evaluation Team] report with adjustment as necessary, a new cost-technical trade-off analysis, and a new Source Selection Authority (SSA) Decision."  Id. at 3554.  The GAO accordingly dismissed the bid protest as academic.  Id. at 3838.

On May 29, 2015, the ATA issued a document titled "Corrective Action Best Value Tradeoff and . . . Award Recommendation" that was signed by both the contracting officer and an agency attorney.  Id. at 3555-65.  The contracting officer reviewed the Technical Evaluation Team's evaluations of plaintiff's and VariQ's nonprice proposals.  Id. at 3559-62.  She explained that she did not make any changes to the adjectival ratings assigned by the Technical Evaluation Team to VariQ's nonprice proposal; indeed, in her comments, she merely reported the Technical Evaluation Team's conclusions and indicated her concurrence.  Id. at 3561-62.

With respect to plaintiff's proposal, the contracting officer first concurred with the Technical Evaluation Team's assessment that plaintiff's proposal deserved a superior rating for the first technical factor, Technical Compliance.  Id. at 3559.  Then, after incorrectly representing that the Technical Evaluation Team had assigned a superior rating to plaintiff's proposal for the

Corporate Experience factor, she determined that a superior rating was appropriate.[11]   Id.   Finally, for the Past Performance factor, she reiterated the Technical Evaluation Team's comments and explained:

> As a result of the corrective action review, the Contracting Officer determined that the past performance rating appears to be incorrect considering these responses were outstanding and although provided by teaming partners these reviews should have been fully considered and assessed in accordance with the terms and conditions of the solicitation.   Nowhere in the solicitation does it state that past performance assessments must be for the prime only.   Therefore, the Contracting Officer is hereby reassessing FFL Pro LLC's past performance as exceptional. Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform or exceed the requirements.   It is unlikely that Government intervention will be needed in order to obtain the required services.

Id. at 3560.   Based on these revised adjectival ratings, the contracting officer upgraded the overall adjectival rating for plaintiff's nonprice proposal to superior.   Consequently, the proposals submitted by plaintiff and VariQ were assigned identical adjectival ratings.   Id. at 3561.

> The contracting officer then set forth her best value tradeoff analysis:

> Both VariQ Corporation and FFL Pro LLC received overall technical ratings of Superior.   In accordance with the solicitation, technical is more important than price, and both VariQ and FFL Pro are the only firms with overall 'Superior' technical ratings.

> I considered not just the assigned ratings but the relative strengths and merits of each proposal by Factor . . . and have determined that although not identical, the 2 firms are essentially equal.   In reviewing the strengths relative to each Factor, I did not find any strengths that would distinguish one proposal as superior to the other . . . .   While each proposal is considered superior and offers beneficial strengths, they are essentially equal.

---

[11]   The contracting officer subsequently suggested to the GAO, in her statement of facts, that she had recognized the error and changed the rating upon a review of the Technical Evaluation Team's evaluation.   See AR 3735 ("The [Technical Evaluation Team] also appeared to have erroneously applied a 'Good' rating rather than a 'Superior' [rating] to FFL Pro for its Corporate Experience.   Based on the strengths identified by the [Technical Evaluation Team] and the summary findings, I determined the 'Superior' rating was most appropriate." (citation omitted)).

> VariQ Corporation received a technical rating of Superior and submitted a price proposal . . . for a grand total of $5,303,260.23. FFL Pro received a technical rating of Superior and submitted a price proposal . . . for a grand total of $7,312,591.18. Notwithstanding [its] technical rating of Superior, FFL Pro, LLC's price offer is $2,009,330.95 higher than that of VariQ's offered price. I did not find that the strengths offered by FFL Pro were worth the payment of a price premium over those offered by VariQ.

Id. at 3562. The contracting officer therefore concluded that VariQ should retain the contract that it was originally awarded. Id. at 3564.

The ATA advised plaintiff and VariQ of its new decision on June 2, 2015. Id. at 3566-68. Plaintiff received a written debriefing on June 10, 2015, id. at 3575-83, and five days later, lodged a second bid protest at the GAO, id. at 3583.001-.012. In this second bid protest, plaintiff challenged, among other things, the adjectival ratings assigned to VariQ's proposal for the Corporate Experience and Past Performance factors, the ATA's purported overweighting of the Price factor, and the ATA's determination that VariQ's nonprice proposal was "essentially equal" to plaintiff's nonprice proposal. Id. at 3583.001-.002. The GAO denied plaintiff's protest on September 22, 2015. Id. at 3835-48.

### D. Current Bid Protest

Less than three weeks later, on October 9, 2015, plaintiff filed the instant bid protest. In its complaint, it sets forth six claims for relief. Compl. ¶¶ 37-70. First, plaintiff contends that the ATA improperly deviated from the past performance criteria set forth in the solicitation when evaluating VariQ's proposal. Id. ¶¶ 37-45. Second, plaintiff contends that the ATA's evaluation of VariQ's proposal on the Corporate Experience factor was unreasonable. Id. ¶¶ 46-52. Third, plaintiff contends that the ATA misevaluated VariQ's proposal on the Technical Compliance factor. Id. ¶¶ 53-56. Fourth, plaintiff contends that the ATA's best value determination was flawed. Id. ¶¶ 57-61. And, in its final two claims for relief, plaintiff contends that it is entitled to equitable relief–both a declaratory judgment and a permanent injunction. Id. ¶¶ 66-70; accord id. at 25 (containing plaintiff's request for relief).

Both parties have moved for judgment on the administrative record pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The motions are fully briefed, and the court heard argument on December 14, 2015.

### II. DISCUSSION

In ruling on motions for judgment on the administrative record pursuant to RCFC 52.1(c), "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)).

Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." <u>Bannum</u>, 404 F.3d at 1356.

## A.  Standard of Review

When entertaining a motion for judgment on the administrative record in a bid protest, the United States Court of Federal Claims ("Court of Federal Claims") reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2012).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  <u>Banknote Corp. of Am. v. United States</u>, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  <u>Centech Grp., Inc. v. United States</u>, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

"Contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  <u>Impresa</u>, 238 F.3d at 1332-33 (quoting <u>Latecoere Int'l, Inc. v. U.S. Dep't of the Navy</u>, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Thus, the court's review of a procuring agency's decision is "highly deferential."  <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1058 (Fed. Cir. 2000); <u>see also</u> <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").  Furthermore, when engaging in a negotiated procurement, a "protestor's burden of proving that the award was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law is greater than in other types of bid protests."  <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1330 (Fed. Cir. 2004).  And, when a contract is to be awarded on a "best value" basis, contracting officers have "even greater discretion than if the contract were to have been awarded on the basis of cost alone."  <u>Id.</u> (citing <u>E.W. Bliss Co. v. United States</u>, 77 F.3d 445, 449 (Fed. Cir. 1996) ("Procurement officials have substantial discretion to determine which proposal represents the best value for the government.")).

Given the highly deferential standard of review, when a protester challenges the procuring agency's decision as lacking a rational basis, "the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  <u>Impresa</u>, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); <u>accord</u> <u>Advanced Data Concepts</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").  When a protester claims that the procuring agency's

decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial."  Impresa, 238 F.3d at 1333 (internal quotation marks omitted).

In addition to showing "a significant error in the procurement process," a protester must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote, 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.");  Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a 'substantial chance that [it] would receive an award–that it was within the zone of active consideration.'" (quoting CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1574-75 (Fed. Cir. 1983))).

## B.  The ATA's Evaluation of VariQ's Past Performance

Plaintiff first argues that the ATA did not properly evaluate VariQ's proposal under the Past Performance factor.  Specifically, plaintiff contends that the ATA deviated from the past performance criteria set forth in the solicitation in several ways:  (1) the ATA did not determine whether VariQ and its subcontractors met the "minimum" past performance requirements; (2) the ATA improperly evaluated the past performance of VariQ and its subcontractors under the "exception" to the "minimum" past performance requirements; and (3) even if the "exception" to the "minimum" past performance requirements were applicable, the ATA improperly evaluated the past performance of VariQ and its subcontractors.  Pl.'s Mot. 29-31.  To determine whether the ATA deviated from the requirements of the solicitation in evaluating the past performance of VariQ and its subcontractors,[12] the court must examine both the relevant language of the Past Performance factor description and the ATA's analysis of VariQ's proposal under the Past Performance factor.

### 1.  Standard for Interpreting a Solicitation

As an initial matter, the court must ascertain what the ATA was required to evaluate under the Past Performance factor pursuant to the terms of the solicitation.  The court interprets a solicitation in the same manner as it would a contract.  See Banknote, 365 F.3d at 1353 n.4

---

[12]  As clarified by the questions and answers contained within Amendments 001 and 002 to the solicitation, each offeror and subcontractor was required to independently comply with the past performance requirements.  See AR 279, 287-88, 417.

(citing Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 997-98 (Fed. Cir. 1996)).  Thus, as with the interpretation of a contract, the "[i]nterpretation of the solicitation is a question of law . . . ."  Id.  The court begins by examining the solicitation's plain language, and in doing so considers "the solicitation as a whole, interpreting it in a manner that harmonizes and gives reasonable meaning to all of its provisions."  Id.  "If the provisions of the solicitation are clear and unambiguous, they must be given their plain and ordinary meaning; [the court] may not resort to extrinsic evidence to interpret them."  Id.

However, when the language of the solicitation "is susceptible to more than one reasonable interpretation," the solicitation is ambiguous.  Id.  If the solicitation contains an ambiguity, then the court must determine whether that ambiguity is patent.  Grumman Data Sys., 88 F.3d at 997.  "A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."  Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000).  Patent ambiguities are "'obvious, gross, [or] glaring.'"  Grumman Data Sys., 88 F.3d at 997 (quoting H & M Moving, Inc. v. United States, 499 F.2d 660, 671 (Ct. Cl. 1974)).  If a solicitation contains a patent ambiguity, the protester's interpretation of the solicitation will fail unless it previously sought clarification from the procuring agency regarding the ambiguous language.  Id. at 997-98; accord Stratos Mobile Networks USA, 213 F.3d at 1381.  If the ambiguity is not patent and the protester demonstrates that it relied upon the ambiguity, then the court applies the general rule that the ambiguity will be construed against the drafter of the solicitation–the procuring agency.  See NVT Techs., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004).

## 2.  The ATA Could Evaluate the Past Performance of VariQ and Its Subcontractors Using Either the Threshold or Residual Criteria Set Forth in the Solicitation

Underlying all of plaintiff's contentions is plaintiff's assertion that under the solicitation, the ATA was required to first determine whether an offeror and each of the offeror's subcontractors met the threshold past performance requirements; namely, providing a description of three projects that demonstrated experience in the subject matter of the solicitation, with at least two of those projects being "prior federal government with overseas deployment training experience on cyber training."  AR 455.  Then, plaintiff contends, if, and only if, an offeror or subcontractor did not "provide three examples of past performance," id., could the ATA evaluate additional information that demonstrated the experience of the offeror or subcontractor. Defendant disagrees with plaintiff's interpretation of the Past Performance factor description, contending that the ATA allowed itself some flexibility in evaluating past performance when it drafted the solicitation.  Specifically, defendant contends, the solicitation provided that if an offeror or a subcontractor could not identify three examples of past performance that related to the subject matter of the solicitation (with two of those examples being from projects for the federal government for the provision of overseas cyber training), then the ATA could review additional information from the offeror or subcontractor that demonstrated its experience.  The

court agrees with defendant that the solicitation reflects a more flexible approach to evaluating the proposals under the Past Performance factor than what plaintiff suggests.

The parties' arguments center on the following portion of the Past Performance factor description:

> Provide a description of the offeror's experience in the professional information technology services and cyber training services industries referenced in the [request for proposals]. Describe three completed or on-going project(s) . . . . Two of the three projects described must be prior federal government with overseas deployment training experience on cyber training. . . . If the Offeror cannot provide three examples of past experience, [it] may provide additional documentation to substantiate project experience to be evaluated by the Contracting Officer.

Id. Under the plain language of this provision, if an offeror or subcontractor identified fewer than three examples of qualifying past experience, it was entitled to submit additional information to expound upon its experience. Nothing in this language prevented the offerors or subcontractors from supplying information pertaining to other projects to "substantiate [the] project experience to be evaluated by the Contracting Officer." Id. Moreover, because the plain language of the provision indicates that the ATA would accept a proposal containing fewer than three examples of past experience,[13] the requirement that two of the described projects be for the provision of overseas cyber training for the federal government must only have applied when three examples of qualifying past experience were supplied. Accordingly, plaintiff's interpretation of the solicitation–which precludes an offeror or subcontractor from providing information regarding other projects to substantiate their experience if they have fewer than three examples of qualifying past performance–is not reasonable. Offerors and subcontractors were permitted to submit three examples of past performance regardless of whether they were able to meet the requirement that two of the projects be for the provision of overseas cyber training for the federal government.

On the other hand, plaintiff's interpretation of what offerors and subcontractors were required to demonstrate under the Past Performance factor if they did not provide three examples of qualifying past performance is eminently reasonable. As plaintiff notes, the Past Performance factor description provides a laundry list of what must be demonstrated with the "additional documentation" supplied by offerors and subcontractors who were unable to provide three examples of qualifying past performance, including:

---

[13] Indeed, elsewhere in the solicitation, when describing the adjectival ratings it would assign for the Past Performance factor, the ATA indicated that the failure of an offeror or subcontractor to submit examples of past performance would result in the assignment of a neutral rating, and the submission of "[i]nappropriate past performance" would result in the assignment of an inadequate rating. AR 57.

Offerors shall demonstrate that the tasks performed are of a similar complexity to
the work solicited under this solicitation.  Demonstrate the ability to manage a
multi-million dollar series of training in a global theatre.  Many simultaneous
iterations requiring expanded staffing resources to support deliveries.
Demonstrated experience should include direct support of an international law
enforcement training program.  . . . Illustrate experience in the acquisition,
configuration and international shipping of various computer related components.
Demonstrate existing OEM (Original Equipment Manufacturer) partnerships and
the ability to forge necessary manufacturer relationships to ensure compliance
with required licensing and End User License Agreements.

Id.  Defendant does not dispute these requirements.

With this interpretation of the Past Performance factor description in mind, the court
turns to plaintiff's contention that the ATA did not properly evaluate the past performance of
VariQ and its subcontractors.

### 3.  Standard for Reviewing a Procuring Agency's Evaluation of Past Performance

As noted above, because "[p]rocurement officials have substantial discretion to determine
which proposal represents the best value for the government," E.W. Bliss, 77 F.3d at 449, a
protester bears a heavy burden in proving that an agency's decision to award a contract in a best
value procurement lacked a rational basis, Galen Med. Assocs., 369 F.3d at 1330.  Accordingly, a
court generally will not "second guess" the ratings assigned by procurement officials responsible
for evaluating proposals.  E.W. Bliss, 77 F.3d at 449.  Indeed, "[i]n protests challenging an
agency's evaluations of an offeror's technical proposal and past performance, review . . . should
be limited to determining whether the evaluation was reasonable, consistent with the stated
evaluation criteria and complied with relevant statutory and regulatory requirements." Banknote
Corp. of Am. v. United States, 56 Fed. Cl. 377, 381 (2003), aff'd, 365 F.3d at 1345.

### 4.  The Failure of VariQ and Its Subcontractors to Satisfy the Threshold Past Performance Criteria Does Not Render the ATA's Evaluation of VariQ's Proposal Improper

With respect to the initial criteria set forth in the Past Performance factor description,
plaintiff contends that the ATA failed to evaluate the past performance of VariQ and its
subcontractors under those criteria, and even if it did, VariQ and its subcontractors did not satisfy
those criteria.  Specifically, plaintiff contends that neither VariQ nor its subcontractors met the
requirement that two of three projects submitted as examples of past performance be for the
provision of overseas cyber training for the federal government (either directly or indirectly).[14]

---

[14]  Plaintiff advances another contention–that VariQ and its subcontractors did not
indicate whether, with respect to their completed projects, the ordering entity found the services

Defendant does not challenge plaintiff's contention, which is supported by the contents of VariQ's proposal.  See generally AR 758-75.  However, the failure of VariQ and its subcontractors to meet this requirement does not mean that the ATA improperly evaluated VariQ's proposal.  Rather, as noted above, offerors and subcontractors who could not meet the threshold past performance criteria were entitled to establish their experience under the remaining criteria in the Past Performance factor description.

### 5.  The ATA's Evaluation of VariQ's Past Performance Does Not Demonstrate the Consideration of Relevant Factors

Plaintiff next contends that if the ATA was correct to evaluate VariQ's proposal under the remaining criteria in the Past Performance factor description, its evaluation lacked a rational basis because VariQ and its subcontractors did not meet those criteria.  Specifically, plaintiff contends that neither VariQ nor its subcontractors "managed a multimillion dollar series of training in a global theatre with many simultaneous iterations requiring expanding staffing resources to support deliveries."  Pl.'s Mot. 32.  Plaintiff further contends that neither VariQ nor its subcontractors had "experience in the acquisition, configuration and shipping of computer components."  Id.  Although defendant does not dispute plaintiff's contentions in its response to plaintiff's motion,[15] and there is support for these contentions in the administrative record, see generally AR 758-75, their accuracy is not relevant.  VariQ and its subcontractors were not required to demonstrate that they had managed such a training program or acquired, configured, and shipped computer components.  Rather, they were required to demonstrate the ability to perform those tasks.[16]

_____

provided to be acceptable.  The court disregards this argument because it is premised on erroneous assertions of fact.  See Pl.'s Mot. 28 (asserting that (1) VariQ did not meet the requirement, but ignoring the fact that the project at issue was not complete at the time VariQ submitted its proposal, and (2) VariQ's subcontractors did not meet the requirement for five of the six projects identified, but ignoring the fact that of those six projects, only two were complete at the time of proposal submission).

[15]  Defendant does address plaintiff's first contention in its reply in support of its cross-motion for judgment on the administrative record.  However, the court normally does not consider contentions that were not advanced in a party's response to a motion.  See Nichols v. Mich. City Plant Planning Dep't, 755 F.3d 594, 600 (7th Cir. 2014) (holding that a nonmoving party "waives any arguments that were not raised in its response to the moving party's motion"); see also SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319 (Fed. Cir. 2006) ("[A]rguments not raised in the opening brief are waived.").

[16]  Although plaintiff may be correct that it has satisfied the Past Performance criteria, plaintiff's experience does not foreclose the possibility or likelihood that VariQ could be successful in carrying out the requirements of the contract.  It would be a non sequitur to suggest

More problematic is the fact that the administrative record lacks any contemporaneous evidence indicating how the ATA determined that VariQ's proposal satisfied the criteria set forth in the Past Performance factor description.  The Technical Evaluation Team's assignment of an exceptional rating for VariQ's past performance was based on (1) a vague assertion that VariQ's "stated past experience" indicated that there was "a high expectation that [VariQ would] be able to perform or exceed the requirements of the statement of work successfully," (2) its conclusion that VariQ's "stated experience [was] centric to cyber training," and (3) its acknowledgment that VariQ had "[e]xcellent reviews from multiple government and public entities."  Id. at 3295.  The contracting officer adopted these findings without further analysis.  In short, neither the Technical Evaluation Team nor the contracting officer explicitly addressed, for any of the nine past performance examples supplied by VariQ and its subcontractors, whether (1) "the tasks performed [were] of a similar complexity to the work solicited under this solicitation"; (2) the projects reflected "the ability to manage a multi-million dollar series of training in a global theatre"; (3) the projects included "[m]any simultaneous iterations requiring expanded staffing resources to support deliveries"; (4) the projects included "direct support of an international law enforcement training program"; (5) the projects "illustrate[d] experience in the acquisition, configuration and international shipping of various computer related components"; and (6) the projects reflected "existing OEM (Original Equipment Manufacturer) partnerships and the ability to forge necessary manufacturer relationships to ensure compliance with required licensing and End User License Agreements."  Id. at 455.  Herein lies the flaw in this procurement.

As noted above, the evaluation and rating of proposals is within the discretion of the procuring agency.  When such actions are being challenged in a bid protest, the court must "determine whether the . . . agency provided a coherent and reasonable explanation of its exercise of discretion . . . ."  Impresa, 238 F.3d at 1333; accord SEC v. Chenery Corp., 332 U.S. 194, 196-97 (1947) ("If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable.  It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").  Moreover, the agency's action must "evinc[e] rational reasoning and consideration of relevant factors."  Advanced Data Concepts, 216 F.3d at 1058.  However, the Technical Evaluation Team's evaluation of VariQ's past performance–twice endorsed by the contracting officer–does not meet these standards because it does not address any of the criteria set forth in the Past Performance factor description; in other words, it does not evince a consideration of relevant factors.  Indeed, the narrative summary provided by the Technical Evaluation Team in support of its exceptional rating is little more than a copy-and-paste of the solicitation's definition of "exceptional."  Compare AR 57 (defining "exceptional" as:  "Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform or exceed the requirements.  It is unlikely that Government intervention will be needed in order to obtain the required services."), with id. at 3295 (containing the following

_____

that because plaintiff is the successful incumbent, no other company could successfully perform the identical contract requirements.

narrative summary: "Based on the vendors [sic] stated past experience and the PPIRs [reports] presented[,] there is a high expectation that the vendor will be able to perform or exceed the requirements of the statement of work successfully.  It is unlikely that Government intervention will be needed in order to obtain the required services.").  Consequently, the court has no basis for determining whether the ATA considered all of the relevant factors when assessing the past performance of VariQ and its subcontractors.[17]  Accord AshBritt, Inc. v. United States, 87 Fed.

---

[17]  The parties' assertions regarding what the ATA did and did not consider in evaluating the past performance of VariQ and its subcontractors is no substitute for the absent ATA analysis.  See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974) (holding that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given"), cited in OMV Med., Inc. v. United States, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (applying the rule in a bid protest); Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962) ("The courts may not accept . . . counsel's post hoc rationalizations for agency action; . . . an agency's discretionary order [can only] be upheld, if at all, on the same basis articulated in the order by the agency itself[.]"); Chenery, 332 U.S. at 196 ("[A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency.  If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.").

    In addition, the contracting officer's subsequent explanation regarding what she considered when performing her best value tradeoff analysis, set forth in her statement of facts submitted to the GAO, is not an adequate substitute for a contemporaneous explanation.  In her statement of facts, the contracting officer merely identified some of VariQ's past performance references, the dates of contract performance, and the contract values; provided general descriptions of the work performed under some of the contracts; indicated the quality of VariQ's performance under some of the contracts; and unclearly stated that VariQ "provided one reference where they were a prime . . . and other references as a subcontractor/teaming partner with overseas experience."  AR 3746-47.  She did not address all of the criteria set forth in the Past Performance factor description, nor did she address any of the past performance information submitted for either of VariQ's subcontractors.  In another portion of her statement of facts in which she responded to plaintiff's protest allegations, the contracting officer did discuss VariQ's subcontractors and provided support for her conclusion that VariQ and its subcontractors had both federal and overseas experience.  However, she still did not address many of the criteria set forth in the Past Performance factor description.  In any event, the court is not inclined to credit the contracting officer's representations to the GAO, as they constitute post hoc rationalizations for the ATA's earlier decision.  See CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 377 (2010) (remarking that there is no legal authority that "requires the court to give" a contracting officer's statement of facts submitted during a GAO bid protest "any independent, let alone dispositive, weight"); Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) ("The Supreme Court has made clear that post hoc rationalizations offered by the agency should be afforded limited importance in the court's

Cl. 344, 370 ("Because the agency has provided no supporting documentation to explain the scores it assigned to [the protester], this Court cannot determine whether the agency's . . . scoring of [the protester's] revised proposal took into account the amplified information on past performance and had a rational basis."), clarified by 87 Fed. Cl. 654 (2009); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."). In the absence of a coherent and reasonable explanation from the ATA of its evaluation of VariQ's proposal under the Past Performance factor, the court cannot ascertain whether the ATA's evaluation had a rational basis.[18]

## C. The ATA's Evaluation of VariQ's Corporate Experience

Plaintiff's second protest ground is that the ATA unreasonably evaluated VariQ's proposal under the Corporate Experience factor. More particularly, plaintiff claims that the ATA assigned strengths to VariQ's proposal that were not related to the criteria set forth in the solicitation's Corporate Experience factor description or the work described in the solicitation's statement of work. Plaintiff further contends that the ATA did not identify the obvious weaknesses and deficiencies in VariQ's proposal.

As previously noted, because a procuring agency has broad discretion in making a best value determination, a court will not disturb the technical ratings assigned by the agency during its evaluation of proposals unless those ratings are (1) unreasonable, (2) inconsistent with the solicitation, or (3) noncompliant with the relevant statutes and regulations. This general prohibition extends to a procuring agency's assignment of strengths, weaknesses, and deficiencies to an offeror's proposal. See, e.g., Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 741-42 (2008) ("The [procuring agency's] conclusion that [the] proposal revisions prompted by discussions were sufficient to eliminate weaknesses and improve some ratings, but insufficient to be assigned strengths or improve other ratings, was well within the [its] discretion in evaluating proposals."); id. at 751-52 ("It was well within the [procuring agency's] broad discretion in evaluating proposals to assign strengths to those offerors that met or exceeded four

---

analysis." (citing Citizens to Preserve Overton Park, 401 U.S. at 419)); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 343-44 (1997) (noting that the court had "a choice about the degree of relevance to assign to" postdecisional documents included in an administrative record).

[18] Given this conclusion, the court need not address plaintiff's remaining arguments regarding the ATA's evaluation of VariQ's proposal under the Past Performance factor, such as plaintiff's contention that the strengths that the ATA assigned to VariQ's proposal were not tied to the express criteria in the Past Performance factor description, or its contention that the ATA improperly focused on VariQ's past work in cyber security, rather than VariQ's past work in overseas cyber security training.

substitute goals and no one else."); see also Aero Corp., S.A. v. United States, 38 Fed. Cl. 739, 763 (1997) ("Decisions as to the adequacy of the information presented in a proposal are . . . rightfully left to the discretion of evaluators . . . .").

Upon reviewing the evidence in the administrative record, the court cannot conclude that the ATA's assignment of strengths to VariQ's proposal under the Corporate Experience factor was, as plaintiff contends, unreasonable or inconsistent with the solicitation. With respect to the first strength identified by the Technical Evaluation Team and endorsed by the contracting officer–"[t]he vendor's core competency is cyber investigations and IT infrastructure"–plaintiff contends that the ATA improperly focused on work not required under the solicitation, rather than on cyber security training. With respect to the second identified strength–"[t]he vendor is well versed in training in an international setting"–plaintiff asserts that VariQ has, at most, minimal corporate experience in overseas cyber security training. And, with respect to the third identified strength–"[r]obust description and identification of key personnel with clear management structure"–plaintiff argues that VariQ did not identify the roles of its proposed key personnel, that the role of one of VariQ's proposed managers is minor, and that VariQ's proposed management structure was not clear. On their face, all but one of plaintiff's contentions amount to nothing more than disagreements with the strengths assigned by the ATA; the remaining contention, that VariQ did not identify the roles of its proposed key personnel, is just incorrect, see AR 750-51 (identifying the program manager and describing his responsibilities), 778 (describing the program manager's role in the transition process), 778-79 (describing, in a table captioned "Organizational Roles & Responsibilities," the role of the program manager).[19] Accordingly, plaintiff has not met its heavy burden of establishing that the ATA's evaluation was unreasonable or inconsistent with the solicitation. Accord Banknote, 56 Fed. Cl. at 384 ("[The protester] offers little more than its disagreements with the [procuring agency's] overall assessment of the adequacy of its proposal versus that of its competitors. Such naked claims, no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.").

Plaintiff's second contention is that when evaluating VariQ's proposal on the Corporate Experience factor, the ATA did not identify the obvious weaknesses and deficiencies related to the provision of course instructors. Specifically, plaintiff argues that the ATA should have assigned significant weaknesses for VariQ's purported failure to demonstrate the "resources available to enable [it] to fulfill requirements," the "manpower presently in-house or the ability to acquire the type and kinds of manpower proposed," and "accessibility to qualified facilitators [who are] eligible to travel on short notice to countries in distant locations," AR 455, because VariQ (1) did not identify any instructors who would be available to perform the contract, (2) did

---

[19] The only key personnel required by the solicitation, AR 303, 329-30, and identified by VariQ in its proposal, id. at 728-47, 750-51, was a program manager.

not demonstrate the capability to identify qualified instructors who could travel internationally on short notice, and (3) unduly relied upon the ATA to assist with the provision of instructors.[20]

As an initial matter, the court notes that neither the description of the Corporate Experience factor contained in the solicitation nor the questions and answers included in the amendments to the solicitation contained a requirement that offerors specifically identify course instructors.  Rather, offerors were only required to "[d]emonstrate accessibility to qualified facilitators."  Id. at 455; accord id. at 289 ("[I]t is the responsibility of the vendor to provide documentation that they are able to provide instructors."); see also id. at 286 (noting that offerors could provide information concerning proposed instructors "if" they had instructors).  Further, plaintiff is incorrect that the ATA assigned a weakness to another offeror for failing to identify course instructors; the weakness assigned by the ATA was for the quality of the instructors that the offeror did identify.  See id. at 3334 ("[T]he vendor states [it has] access to qualified instructors, but only identif[ies] non-key instructors.").  Thus, VariQ's failure to identify any instructors does not, as plaintiff argues, contravene the solicitation.

Plaintiff's other objections are also without merit.  In support of its contention that VariQ did not demonstrate the capability to identify qualified instructors who could travel internationally on short notice, plaintiff merely avers that VariQ's statements were insufficiently specific and that VariQ's supporting evidence was not relevant.  And, in challenging VariQ's statement that it would work with the ATA to identify qualified instructors, plaintiff disregards that the solicitation, and the questions and answers included in the amendments to the solicitation, provided that qualified incumbent instructors would have the right of first refusal to work for the contract awardee, and that the ATA would provide a list of those instructors to the contract awardee.  At bottom, plaintiff's objections are nothing more than disagreements with the ATA's evaluation of VariQ's proposal, and are insufficient to meet plaintiff's heavy burden of establishing that the ATA's failure to assign a weakness on this issue was improper.

---

[20] Plaintiff advances a fourth reason in its reply in support of its motion for judgment on the administrative record:  that VariQ inconsistently indicated in its proposal that (1) "it had a 'pool' of qualified instructors" and (2) it "would have to 'formulate' this instructor pool and 'enhance' its recruitment system," an inconsistency that the ATA considered to be a weakness in another offeror's proposal.  Pl.'s Reply 23 (quoting AR 728, 747).  The court generally disregards arguments first advanced in a reply brief.  See SmithKline Beecham, 439 F.3d at 1319; Novosteel SA v. United States, 284 F.3d 1261, 1274 (Fed. Cir. 2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief–they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").  However, if the court were inclined to address plaintiff's argument, it would reject it.  A reasonable reading of VariQ's proposal is that VariQ would formulate an instructor pool using both instructors in its existing pool and the incumbent's instructors who possessed the right of first refusal to work for the contract awardee.  Accordingly, VariQ's representations are not facially inconsistent.

In sum, plaintiff has not established that the ATA's evaluation of VariQ's proposal on the Corporate Experience factor was unreasonable or inconsistent with the solicitation.

### D.  The ATA's Evaluation of VariQ's Technical Compliance

The third protest ground advanced by plaintiff is that the ATA misevaluated VariQ's proposal on the Technical Compliance factor.  Plaintiff specifically challenges the reasonableness of each of the three strengths assigned by the ATA to VariQ's proposal for this factor, and also complains that VariQ should have been assigned a weakness for its heavy reliance on its subcontractors.

Plaintiff argues that the first assigned strength–"[c]lear understanding of roles and scope of project"–is unreasonable because VariQ proposed work that was beyond the scope of the statement of work.  As plaintiff notes, the ATA explained in the statement of work that it was procuring the "delivery of training courses to include instructors . . . ." Id. at 59.  VariQ, plaintiff avers, proposed to do more.  Quoting several phrases from VariQ's proposal, plaintiff suggests that VariQ proposed to train instructors, develop new courses, and improve existing courses, reflecting its lack of understanding of the project's requirements.  Moreover, plaintiff contends, the ATA assigned weaknesses to the proposals of other offerors for proposing work that was beyond the scope of the statement of work, reflecting the disparate treatment of offerors.  Defendant disagrees with plaintiff's contentions, arguing that this assigned strength is supported by the contents of VariQ's proposal and that the ATA treated all offerors equally.

As a threshold matter, plaintiff misconstrues the contents of VariQ's proposal.  The language quoted by plaintiff is contained in the section of VariQ's proposal that addresses VariQ's corporate experience.  See id. at 788.  In that section, VariQ was not, for the most part, describing the work that it intended to perform under the contract being solicited by the ATA.  Rather, it was describing the work that it currently performs for its clients.  And, to the extent that some of the language quoted by plaintiff could be construed as a proposal to modify and improve the ATA's cyber security training program, see id. (containing VariQ's representation that it was "uniquely suited to effectively transition, maintain, modif[y] and improve the existing Cyber Training Program"), the ATA represented in the questions and answers contained in Amendment 001 to the solicitation that it would entertain suggestions for course improvement during contract performance.

Moreover, the ATA did not treat the offerors unequally.  It is undisputed that procuring agencies "must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria." Banknote, 56 Fed. Cl. at 383 (citing Seattle Sec. Servs., Inc. v. United States, 45 Fed. Cl. 560, 569 (2000)).  Thus, when a procuring agency decides to assign a strength or a weakness for an aspect of one proposal, it must consistently assign that strength or weakness to all proposals.  See, e.g., CMI Mgmt., Inc. v. United States, 115 Fed. Cl. 276, 300-01 (2014) ("It is difficult to reconcile the Agency's assignment of a strength for positive AQL ratings to [one offeror] with its denial of a strength for [the protester's] similar positive

-30-

AQL ratings."); <u>BayFirst Sols., LLC v. United States</u>, 102 Fed. Cl. 677, 686 (2012) ("[The protester] was not assigned a strength . . . despite having presented resumes with the requisite experience, whereas [the contract awardee] was assigned a strength . . . despite having included resumes that clearly did not meet all requirements.  This constitutes either disparate treatment of offerors, or an irrational evaluation of [the contract awardee's] and [the protester's] proposals.").

However, unlike VariQ's proposal, the two proposals cited by plaintiff reflected that those offerors were proposing work that was clearly beyond the scope of the statement of work.  In one proposal, the offeror affirmatively represented, in a section titled "Technical Understanding Response to [Statement of Work] Requirements," AR 1140, that it would "execute the assigned Program of Instruction (POI)," "coordinate with ATA to ensure the latest information on emerging cyber threats is included in the ATA-approved POI," and "customize the content of each engagement to address specific requirements of each country," <u>id.</u> at 1141.  The Technical Evaluation Team accordingly assigned the following weaknesses:  (1) "The vendor does not demonstrate understanding of the requirements of the [statement of work] by stating that [it would] be involved with the execution of POIs," and (2) "The solicitation does not require any course customization or manipulation as implied by the vendor . . . ."  <u>Id.</u> at 3310.  And in the other proposal, the offeror indicated in its "Executive Summary" that it would "conduct[] needs assessments," explaining that "[u]pon appropriate comprehensive Needs Assessments to assess a country partner's present Antiterrorism/CounterTerrorism capabilities . . . , [it would] ensure the coordination of a Country Assistance Plan and adhere to the proper roll-out of the 18 cyber training course segments."  <u>Id.</u> at 1812.  The Technical Evaluation Team accordingly commented:  "The vendor does not have a good understanding of the project requirements.  For example, several references were made of a needs assessment, which [is] not part of this proposal."  <u>Id.</u> at 3328.  In short, for these two offerors, there was support in their proposals for the Technical Evaluation Team's assigned weaknesses and comments.

Plaintiff next argues that the second assigned strength–"[e]xcellent background knowledge of ATA and solicitation requirements"–is unreasonable because neither VariQ nor is subcontractors had any "ATA contracts or firsthand knowledge of ATA," and because VariQ's alleged failure to satisfy the requirements set forth in the Corporate Experience and Past Performance factor descriptions reflected that "any such background knowledge was of little value in understanding the solicitation requirements . . . ."  Pl.'s Mot. 39.  Both arguments are, on their face, nothing more than disagreements with the ATA's assessment of VariQ's proposal.

Plaintiff's objection to the third assigned strength–"[h]as a high probability of success"–is that the strength is unrelated to the factor at issue, under which offerors were to "demonstrat[e] technical understanding of all requirements in the Statement of Work . . . ."  AR 454.  Plaintiff's objection lacks merit.  First, a reasonable reading of the assigned strength is that the ATA concluded that VariQ demonstrated its understanding of the requirements, and therefore had a high probability of successfully meeting those requirements.  Second, the language of the strength is taken directly from the definition of the superior rating, <u>see id.</u> at 56 ("Offer has a high probability of success with the lowest potential for unsuccessful performance."), rendering it

superfluous to the ATA's evaluation, given that the Technical Evaluation Team assigned, and the contracting officer adopted, a superior rating for VariQ's proposal on this factor.[21]

Finally, plaintiff contends that the ATA should have assigned a weakness to VariQ's proposal for VariQ's heavy reliance on its subcontractors because other offerors were penalized for the same transgression. However, aside from remarking that VariQ's proposed program manager and other individuals are employees of one of VariQ's subcontractors, plaintiff does not explain how VariQ's proposed reliance on subcontractors is equivalent to or heavier than other offerors' reliance on subcontractors. And, the court declines plaintiff's implied invitation to review the proposals and make its own determination regarding the offerors' relative reliance on subcontractors for contract performance. Thus, given the deference afforded to a procuring agency's evaluation of proposals, the court cannot conclude that the ATA treated the offerors unequally by failing to assign a weakness to VariQ's proposal for VariQ's purported heavy reliance on its subcontractors.

In sum, plaintiff has not established that the ATA's evaluation of VariQ's proposal on the Technical Compliance factor was unreasonable or inconsistent with the solicitation.

### E. The Contracting Officer's Best Value Determination

As its final protest ground, plaintiff contends that the contracting officer's best value determination was flawed. Initially, plaintiff contends that the ratings that the ATA assigned to VariQ's proposal for the three most important nonprice factors were unreasonable and inconsistent with the solicitation. Plaintiff further contends that its proposal was far superior to the proposal submitted by VariQ. Accordingly, in plaintiff's view, the contracting officer's determination that the two proposals were "essentially equal" under the nonprice factors lacks a rational basis. Moreover, plaintiff argues, the contracting officer's best value determination reflects a misunderstanding of the relative importance of the evaluation factors set forth in the solicitation.

As explained above, the ratings assigned by the Technical Evaluation Team and adopted by the contracting officer for VariQ's proposal under the Corporate Experience and Technical Compliance factors were not unreasonable or inconsistent with the solicitation. However, the court was unable to determine whether the ATA's evaluation of VariQ's proposal under the Past Performance factor was similarly reasonable and consistent with the solicitation because the ATA did not provide a coherent and reasonable explanation reflecting that it considered all of the

---

[21] Plaintiff lodges a second objection to the third assigned strength in its reply in support of its motion for judgment on the administrative record–that the ATA did not assign this strength to any other offeror. As noted above, the court is disinclined to address arguments first raised in a reply brief. See SmithKline Beecham, 439 F.3d at 1319; Novosteel SA, 284 F.3d at 1274. Moreover, the court's conclusion that the third assigned strength was superfluous to the ATA's evaluation renders this late-asserted objection moot.

relevant factors.  As a result, the court cannot ascertain the propriety of the exceptional rating assigned to VariQ's proposal for the Past Performance factor or the superior rating assigned to VariQ's nonprice proposal overall.  And, in the absence of such information, it is impossible to assess the propriety of the contracting officer's best value determination.[22]  In short, the ATA's decision to award the contract to VariQ lacked a rational basis.

Due to its effects on the best value determination and the subsequent award of the contract to VariQ, the ATA's failure to provide an explanation for its evaluation of VariQ's proposal on the Past Performance factor constitutes a significant procurement error.  Indeed, pursuant to the solicitation, the Past Performance factor is the third most important factor to be considered by the ATA.  Thus, a different evaluation under this factor might affect the results of the contracting officer's best value tradeoff analysis and, therefore, the award of the contract. Moreover, this error is prejudicial to plaintiff.  When the contracting officer conducted her best value tradeoff analysis after the first GAO protest, she limited her discussion to the proposals submitted by plaintiff and VariQ.  And, if VariQ's proposal is assigned a rating other than exceptional for the Past Performance factor, the contracting officer could alter her assessment that plaintiff's high technical ratings were not worth the $2 million price premium, especially in light of the fact that price was the least important factor under the solicitation.  Thus, there was a substantial chance that plaintiff would have been awarded the contract absent the ATA's error.

### F.  Plaintiff's Request for Injunctive Relief

Because plaintiff has established the existence of a significant, prejudicial procurement error, the court must address plaintiff's request for injunctive relief.  The Court of Federal Claims has the authority to award injunctive relief pursuant to 28 U.S.C. § 1491(b)(2), and is guided in making such an award by RCFC 65(d).  In determining whether to award a permanent injunction, a court must consider whether (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships favors the grant of injunctive relief; and (4) it is in the public interest to grant injunctive relief.  PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  Plaintiff has succeeded on the merits, and defendant concedes that plaintiff has satisfied the remaining three factors. Accordingly, an award of injunctive relief is appropriate in this matter.

---

[22]  As a result, the court cannot assess the merits of plaintiff's remaining arguments–that plaintiff submitted the superior proposal to the ATA, that it was error for the contracting officer to declare its proposal to be "essentially equal" to the proposal submitted by VariQ, and that the contracting officer misunderstood the relative importance of the evaluation factors.

## III.  CONCLUSION

For the reasons set forth above:

- Plaintiff's motion for judgment on the administrative record is **GRANTED IN PART** and **DENIED IN PART**.

- Defendant's cross-motion for judgment on the administrative record is **GRANTED IN PART** and **DENIED IN PART**.

- Because the ATA did not provide an explanation for its evaluation of VariQ's proposal on the Past Performance factor, the ATA's Past Performance and Overall ratings for VariQ's proposal must be **SET ASIDE** as arbitrary and capricious.  Consequently, the contracting officer's best value determination, which is based, in part, on those ratings, must also be **SET ASIDE** as arbitrary and capricious.

- The appropriate procurement officials at the ATA shall, at a minimum, (1) reassess VariQ's proposal under the Past Performance factor, (2) assign new ratings for both the Past Performance factor and the nonprice proposal overall, (3) perform a new best value tradeoff analysis that takes into account the new ratings, and (4) make a new award decision.  Performance of the contract awarded to VariQ is **ENJOINED** pending the ATA's corrective action.

Should plaintiff file another bid protest in this court in conjunction with the solicitation at issue here, the clerk shall waive the court's filing fee and assign the bid protest to the undersigned.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Monday, January 4, 2016**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

No costs.  The clerk is directed to enter judgment in accordance with this Opinion and Order.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-34-